# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRAIG ELIAS, | ) |
| Petitioner, | )    Civil Action No. 14 – 1337 |
| v. | )    Magistrate Judge Lisa Pupo Lenihan |
| BRIAN COLEMAN, *Warden SCI-Fayette* and THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, | ) |
| Respondents. | ) |

## MEMORANDUM OPINION

Petitioner Craig Elias ("Elias" or "Petitioner") has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition") seeking relief from his January 22, 2004 judgment of sentence of life imprisonment after a jury found him guilty of first-degree murder, two counts of kidnapping, and one count each of robbery, aggravated assault, simple assault, and abuse of a corpse.[1] For the following reasons, the Petition will be denied.

## I.   Facts of the Crime

As stated by Judge Manning in his Opinion dated December 29, 2005, the facts of the crime are as follows:

> . . . . The defendants and the victims, Anthony Brownlee and Andrew Jones, had known each other for several years prior to the incidents that gave rise to this case. The defendants attended Mount Lebanon High School together.

---

[1] Petitioner was charged by Criminal Informations filed in the Court of Common Pleas of Allegheny County, Criminal Division at CC200205482, CC200205909, and CC200205952. His case was joined with those of his co-defendants, Jared Henkel and Jared Lischner.

Henkel had known Brownlee since they were both approximately 15 and defendants Lischner and Elias became acquainted with him through Henkel. Jones was a friend of Brownlee. Brownlee and Jones supplied Henkel with marijuana and cocaine. Eventually, the victims and the defendants Henkel and Elias worked together selling drugs. In February 2002 Henkel leased 220 Sycamore Street in the Mount Washington area of Pittsburgh to be used by him and his friends to stash drugs and money and to use for drug transactions. Two safes were installed in the home by Henkel, Elias and Jones. Henkel, Elias and Jones all had keys to the house.

On March 22, 2002 Brownlee was with Jones when Jones received a call on his cell phone. Jones told Brownlee that the call was from Henkel; that the house on Sycamore Street had been robbed and that Henkel wanted Jones to meet him at the Parkway Center Mall. They proceeded to a pool hall at the mall where Jones received another call from Henkel. When the call ended, Jones told Brownlee that he had to go to the Sycamore house and asked him to come along. Reluctantly, Brownlee agreed and they drove to Sycamore Street.

At about the same time, the defendants met Matthew Henkel, Jared's brother, outside a convenience store to retrieve duct tape that Matthew had been asked to bring. The defendants took the duct tape from Matthew Henkel and drove to Sycamore Street and met Brownlee and Jones, who had arrived several minutes earlier. All five spent some time discussing the safes that were discovered missing from the residence and speculating a[s] to who may have taken them. Brownlee, Elias and Henkel then went upstairs to where the safes had been. After a short discussion, Henkel returned downstairs and Elias asked Brownlee who he thought had stolen the safes. When Brownlee responded that he did not know, Elias punched him, knocking him to the floor. Elias jumped on Brownlee and began to strike him about the head and upper body.

Brownlee was then thrown or dragged down the steps and placed in the kitchen, where Jones was being held face down on the floor by Lischner. Henkel and Lischner bound Jones' hands and feet with duct tape. Elias did the same to Brownlee. The victims were both then carried upstairs and placed in separate bedrooms. Over the course of the next several hours, Brownlee was interrogated by all three defendants. Elias would beat him and threaten him, demanding that he tell them where the safes were. When he would leave, Henkel and Lischner would question him. Three times, Elias choked him with a rope, nearly to unconsciousness. Eventually, Brownlee convinced them to allow him to call a friend, Scott Carlin, and have him retrieve $4,000.00 that Brownlee had hidden at his home and bring it to Sycamore Street. The defendants agreed and assured Brownlee that if he gave them the money, they would allow him and Jones to leave.

Brownlee called Carlin and asked him to retrieve the money. Carlin did, and left the money in the car that Jones and Brownlee had driven to Sycamore Street. It was retrieved by one of the defendants. After receiving the money, however, they refused to allow Brownlee and Jones to leave. More money was demanded. Brownlee told the defendants that he had more money buried in his basement, but that he would have to get it himself. Elias said that he did not believe him and resumed beating him. At one point, he lifted Brownlee up with a rope wrapped around his neck. Brownlee feigned passing out and Elias stopped choking him. When Elias told him that if they did not get the money, no one would be able to help him, Brownlee offered to go get the money from his basement. Elias left the bedroom and Lischner came in and removed the duct tape. He told Brownlee that he would be leaving with Henkel to get the money.

Sometime prior to Lischner unbinding Brownlee Jared Henkel called his brother Matthew and asked him to borrow a pick-up truck and bring it to the Sycamore residence. While Matthew Henkel was waiting for his friend to drop off the truck, he received another call from his brother who asked that he obtain bags of cement. Matthew Henkel telephoned his father to ask for money to purchase the bags of cement but his father refused to provide the money. Eventually, the friend arrived with the pick-up truck in front of that address. He entered the residence where he saw Jared Lischner and Craig Elias. He observed Craig Elias repeatedly traveling up and down the stairs. He also noted that Elias had rubber gloves on. At one point, his brother Jared came down the steps holding one of Andy Jones' shoes. Jared Henkel took it outside and compared it to a shoe print on the snow outside a broken back window. It appeared that the defendants were trying to determine if the window had been kicked out from inside or outside of the house. He recalled his brother commenting that "it was an inside job." During his time in the house, Matthew Henkel saw defendants, Lischner and Elias, frequently travel up and down the steps. He said, however, that his brother remained with him on the first floor throughout the entire time. The prosecutor then asked:

Q:     What happened?

A:     My brother came over to me and stated that Andy was too dangerous to let go and he was taking Tony out, but Andy would be too dangerous, he would come after me, come after the family, and that we would never be able to be safe.

Q:     Where were the other defendants when your brother started making these statements to you?

A:     They were standing right there.

Q:     Tell us everything you remember about what anybody, yourself
       included, did or said when defendant Henkel began this topic,
       began making those statements.

A:     I agreed with him as well did Craig and Jared Lischner.  We were
       all in agreement.

Q:     You agreed that what?

A:     That Andy was a very dangerous person, that if he was let go, he
       would come back to seek revenge.

Q:     Tell us anything else that you remember about the conversation.

A:     I remember stating that they couldn't kill both of them and that
       they needed to let Tony go.  He wasn't a risk.  He wasn't going to
       go to the Police.  He was a drug dealer.  I said that.  I said that I
       didn't think Tony was a threat, but I did agree that Andy was.

Q:     Do you remember what defendant Elias was saying during this
       period?

A:     He was in agreement.

Q:     Do you remember what defendant Lischner said?

A:     He was also in agreement.

After this conversation ended, Jared Henkel pretended that he received a
phone call.  He then had Matthew Henkel open and shut the front door to make it
appear as if Matthew Henkel had just arrived.  Jared Henkel then went up and
returned with Anthony Brownlee.  While Jared Henkel was upstairs getting
Brownlee, Craig Elias told Matthew Henkel to get weights from his father's house
and bring them back with him.  He then went outside and, a short time later, his
brother and Anthony Brownlee followed and entered the pick-up truck.
Defendants Lischner and Elias were still in the house, with Andrew Jones, when
Matthew Henkel left the Sycamore Street address.

Matthew Henkel drove to his house where he, his brother and Anthony
Brownlee entered.  His brother and Anthony Brownlee went upstairs while he
went downstairs, retrieved the 50 pound weight, took it out to the pick-up truck,
and then drove back to the Sycamore Street address.  He parked in front of the
street and then attempted to enter the front door but found it locked.  He knocked
and Craig Elias let him into the house and asked him to come upstairs because he
had to show him something.  Henkel followed him upstairs and observed Andrew

Jones lying on his left side in the one bedroom. His legs and hands were bound and he had a plastic bag over his face. Craig Elias told him he had to wrap the body. Matthew Henkel asked Elias "is he alive," to which Elias responded, "what the fuck do you think." They then wrapped Andrew Jones' body in garbage bags. Elias told Henkel to bring the pick-up truck around to the side of the house. He did so, and they loaded the body of Andrew Jones into the back of the pick-up truck.

At approximately the same time that Matthew Henkel had arrived at the Sycamore Street address with the white pick-up truck the first time, defendant Elias called a friend, Michael Latusek, and asked him if he would help him burn a car for insurance. Latusek testified that he and Elias had discussed burning their cars for the insurance money in the past, although they never actually did it. Latusek asked to meet with Elias in person to discuss this rather than talking about it over the phone. Latusek then drove to his apartment located on Mary Street on the Southside. As he approached, he saw Jared Lischner walking on the sidewalk a few feet from his house. He stopped and picked Lischner up and asked where Elias was. Lischner indicated that he was at a friend's house. Lischner asked Latusek to help him burn a car that had already been taken to a wooden area. Latusek agreed to allow Lischner to use his car but did not want to go with him. Latusek asked Lischner to drop him off at a friend's house while Lischner left to burn the car. According to Latusek, he was dropped off at his friend's house while Lischner took his vehicle for approximately an hour. When Lischner returned with Latusek's car, Latusek noticed the odor of gasoline or a similar substance emanating from Lischner. Latusek then drove with Lischner and his friend to Mt. Lebanon where Lischner was dropped off at Jared Henkel's residence.

After Elias and Matthew Henkel had loaded Andrew Jones' body in the back of the pick-up truck, Matthew Henkel drove the pick-up truck and followed Elias in his car to the Southside where Elias dropped the car off. Elias then got in the pick-up truck and told Matthew Henkel to drive toward Parkway. They stopped at a Lowe's Home Improvement Center located in Robinson Towne Center. Elias gave Matthew Henkel some money and instructed him to go into the Lowes and buy chains and locks. Elias did the same, although they checked out separately. Their appearance at the Lowes was recorded on a surveillance camera. When they left the Robinson Towne Center, they drove through West Virginia to Steubenville, Ohio. During this drive, Matthew Henkel heard Craig Elias speaking on the phone with someone. When that call ended, Elias turned to Henkel and said, "it's been burned." Further on during the drive, Matthew Henkel asked Elias if "Andy had said anything." Craig Elias stated that Andy said, "Craig, you are killing me." Elias told Matthew Henkel that he responded, "I know." Upon arriving at the Steubenville area, they found a bridge that both agreed was a good place to dispose of Mr. Jones' body. They drove across the bridge and looked for an isolated area in Steubenville. When they found it, they

exited the vehicle and wrapped Jones' body with the chains and also used the chains to affix the 50 pound weight to his body, sitting it on his chest. They then returned to the bridge and, when it was sufficiently deserted, threw Andrew Jones into the Ohio River.

Shortly after his release, Anthony Brownlee contacted Andrew Jones' family trying to locate him. Eventually, Mr. Jones' disappearance was reported to the police as was the involvement of the three defendants in that disappearance. They were arrested and charged with Kidnapping, Robbery, and other offenses involving the abduction of Brownlee and Jones. When Andrew Jones' body was discovered in the Ohio River, the charge of Criminal Homicide was added. During the investigation into the disappearance of Andrew Jones and the abduction of Andrew Brownlee, Matthew Henkel agreed to become a cooperating witness and lead the police to the area where he and Craig Elias disposed of Andrew Jones' body.

(Resp't Ex. 14, ECF No. 11-6, pp.8-14) (internal citations to record omitted).

## II. **Relevant Procedural Background**

On October 14, 2003, Petitioner, Jared Henkel[2] and Jared Lishner[3] appeared before Judge Jeffrey A. Manning and proceeded to a jury trial. Petitioner was represented at trial by Attorney Duke George ("Mr. George"), Jared Henkel was represented by Attorney Thomas R. Ceraso ("Mr. Ceraso"), and Jared Lischner was represented by Attorney Patrick J. Thomassey ("Mr. Thomassey"). The Commonwealth was represented by Assistant District Attorney Thomas F. Merrick ("ADA Merrick"). On October 21, 2003, the jury returned its verdict finding Petitioner guilty of first-degree murder, two counts of kidnapping, and one count each of robbery,

---

[2] Jared Henkel was charged with criminal homicide, two counts of kidnapping and aggravated assault, and one count each of criminal conspiracy, robbery, simple assault and terroristic threats.

[3] Jared Lischner was charged with criminal homicide, two counts of kidnapping, and one count each of criminal conspiracy, robbery, aggravated assault, simple assault, terroristic threats, arson, and criminal mischief.

aggravated assault, simple assault and abuse of a corpse.[4]  (Resp't Exs. 1-6, ECF Nos. 11-1, 11-2.)  On January 22, 2004, all three defendants were sentenced to an aggregate judgment of sentence of life imprisonment.  (Resp't Ex. 8, ECF Nos. 11-3, 11-4.)

On June 16, 2004, Petitioner filed a direct appeal through Attorney Caroline M. Roberto ("Attorney Roberto").[5]  (Resp't Ex. 12, ECF No. 11-5, pp.13-33.)  Judge Manning issued his Pa. R.A.P. 1925(a) Opinion on December 29, 2005.  (Resp't Ex. 14, ECF No. 11-6.)  Petitioner's appeal was docketed in the Pennsylvania Superior Court at 174 WDA 2004, (Resp't Ex. 15, ECF No. 11-7, pp.1-7), and, on June 14, 2006, during the pendency of the appeal, Petitioner, along with Henkel and Lischner, filed a petition for remand pursuant to Rule 720 of the Pennsylvania Rules of Criminal Procedure and a motion for stay during pendency of the petition for remand. (Resp't Exs. 16 & 17, ECF No. 11-7, pp.8-18.)  Attached to each of their petitions and motions was a signed and sworn affidavit from Diane Henkel, the mother of Matthew and Jared, wherein she attested that she hypnotized Matthew in June or early July of 2003, and that while Matthew was hypnotized, she asked him a number of questions about the kidnapping and murder in order to help him accept his memories and come to terms with the fact that it was not his fault.  Jared Henkel alleged that his brother Matthew's story to investigators drastically changed after he was hypnotized.  The Pennsylvania Superior Court denied the petitions and motions without prejudice, thereby allowing them to raise the hypnotism issue anew in their briefs and at oral argument.  (Resp't Ex. 18, ECF No. 11-7, p.19.)  After reviewing the briefs, the Superior Court

---

[4] Jared Henkel was found guilty of second-degree murder, two counts of kidnapping, and one count each of robbery, aggravated assault, simple assault and criminal conspiracy.  Jared Lischner was found guilty of second-degree murder, two counts of kidnapping, and one count each of robbery, simple assault and criminal conspiracy.

[5] The Pennsylvania Superior Court consolidated the appeals of Petitioner, Henkel and Lischner.

remanded the matter by Order dated March 2, 2007, instructing the trial court to conduct an evidentiary hearing to determine whether Matthew Henkel was hypnotized by his mother and, if he was, to determine when the hypnosis was induced and what specific portions of Matthew's testimony were elicited by the hypnosis. (Resp't Ex. 22, ECF No. 12-2, pp.15-20.)

The evidentiary hearing was held before Judge Manning on June 5-7, 2007, during which time the trial court heard testimony from, among others, Matthew, his mother, and various experts on hypnotism. (Resp't Exs. 23-28, ECF Nos. 12-3 – 12-10, 13-1 – 13-8.) Following the hearing, Judge Manning issued an Addendum to his Pa. R.A.P. 1925(a) Opinion, in which he found that Matthew Henkel had not been hypnotized by this mother after the evidence demonstrated that "Mrs. Henkel had no training or experience in the practice of inducing hypnotic trance in others." (Resp't Ex. 29, ECF No. 14-1.) Elias, Henkel and Lischner each filed briefs challenging the trial court's factual findings, and in a Memorandum issued on November 14, 2007, the Pennsylvania Superior Court affirmed the judgment of sentence of all three men. (Resp't Ex. 33, ECF No. 14-4, pp.11-26.) Their application for reargument en banc was denied on January 23, 2008. (Resp't Ex. 35, ECF No. 14-8, p.1.) On February 22, 2008, Petitioner, through Attorney Roberto, filed a Petition for Allowance of Appeal ("PAA") in the Supreme Court of Pennsylvania docketed at 115 WAL 2208. (Resp't Exs. 36, 37, ECF Nos. 14-8 – 14-12.) On August 25, 2008, the Supreme Court denied the PAA. (Resp't Ex. 38, ECF No. 14-13.)

On March 31, 2009, Petitioner filed a *pro se* petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"). (Resp't Ex. 39, ECF Nos. 15-1, 15-2.) On July 8, 2009, Petitioner, through Attorney Roberto, filed an Amended PCRA Petition. (Resp't Ex. 40, ECF No. 15-3, pp.1-7.) On January 11, 2010, Petitioner, through Attorney Roberto, filed an Amended

PCRA Petition to Join Co-Defendant Lischner's Selected Issues. (Resp't Ex. 43, ECF No. 15-3, pp.13-16.) An evidentiary hearing was held for all three defendants on January 31, 2011. (Resp't Ex. 48, ECF No. 15-6 – 15-8.) On February 17, 2012, Judge Manning filed his Opinion, wherein he denied Petitioner PCRA relief. (Resp't Ex. 50, ECF No. 15-6, pp.16-33.)

On March 6, 2012, Petitioner, through Attorney Roberto, filed a Notice of Appeal, which was docketed in the Pennsylvania Superior Court at 438 WDA 2012. (Resp't Exs. 51, 54, ECF Nos. 15-10, 15-11 pp.10-14.) On August 22, 2012, Judge Manning issued an Order of Court which adopted his February 17, 2012 Opinion and its reasons for denying relief on the claim for which Petitioner was granted an evidentiary hearing. (Resp't Ex. 53, ECF No. 15-11, pp.8-9.) On October 23, 2013, the Pennsylvania Superior Court issued a Memorandum Opinion affirming the denial of PCRA relief. (Resp't Ex. 58, ECF No. 16-7.) Application for reargument en banc was denied on December 24, 2013. (Resp't Ex. 60, ECF No. 16-9, p.1.) On January 22, 2014, Petitioner, through Attorney Roberto, filed a PAA in the Pennsylvania Supreme Court, (Resp't Ex. 62, ECF Nos. 16-10, 16-11), which was docketed at 47 WAL 2014. (Resp't Ex. 61, ECF No. 16-9, pp.2-4.) The Pennsylvania Supreme Court denied the PAA on May 15, 2014. (Resp't Ex. 64, ECF No. 16-12, p.2.)

Petitioner, through Attorney Chris Rand Eyster, filed the instant Petition for Writ of Habeas Corpus on October 2, 2014. (ECF No. 1.) Respondents filed their Answer on December 3, 2014. (ECF Nos. 10-16.) Petitioner filed a Brief in Support of his Petition on September 30, 2015. (ECF No. 31.) The matter is now ripe for review.

### III. Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court may overturn a state court's resolution of the merits of a constitutional issue

only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court of the United States, in Williams v. Taylor, 529 U.S. 362 (2000), discussed the analysis required by § 2254(d)(1):

> [Under the "contrary to" clause], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 1498. The Third Circuit Court of Appeals, consistent with the Williams v. Taylor interpretation, set forth in Matteo v. Superintendent, SCI-Albion, 171 F.3d 877 (3d Cir. 1999), *cert. denied* 528 U.S. 824 (1999), a two-tier approach to reviewing § 2254(d)(1) issues:

> First, the federal habeas court must determine whether the state court decision was "contrary to" Supreme Court precedent that governs the petitioner's claim. Relief is appropriate only if the petitioner shows that "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." O'Brien [v. Dubois], 145 F.3d [16], 24-25 [1st Cir. 1998)]. In the absence of such a showing, the federal habeas court must ask whether the state court decision represents an "unreasonable application" of Supreme Court precedent; that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. If so, then the petition should be granted.

Id. at 891. The phrase "clearly established Federal law," as the term is used in Section 2254(d)(1) is restricted "to the holdings, as opposed to the dicta of [the United States Supreme Court] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 365. Under the "unreasonable application" clause,

> a federal habeas court may not grant relief simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision

is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de novo*

evaluation of the constitutional claim on the merits. *See* Tucker v. Superintendent Graterford

SCI, 677 F. App'x 768, 776 (3d Cir. 2017) (citing Panetti v. Quarterman, 551 U.S. 930, 953

(2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must

then resolve the claim without the deference AEDPA otherwise requires."). Indeed, the Third

Circuit recently explained that,

> [w]hile a determination that a state court's analysis is contrary to or an
> unreasonable application of clearly established federal law is necessary to grant
> habeas relief, it is not alone sufficient. That is because, despite applying an
> improper analysis, the state court still may have reached the correct result, and a
> federal court can only grant the Great Writ if it is "firmly convinced that a federal
> constitutional right has been violated," Williams, 529 U.S. at 389, 120 S.Ct. 1495.
> *See also* Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301
> (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief
> that a prisoner satisfy the AEDPA standard of review . . . none of our post-
> AEDPA cases have suggested that a writ of habeas corpus should automatically
> issue if a prisoner satisfies the AEDPA standard"). Thus, when a federal court
> reviewing a habeas petition concludes that the state court analyzed the petitioner's
> claim in a manner that contravenes clearly established federal law, it then must
> proceed to review the merits of the claim de novo to evaluate if a constitutional
> violation occurred. *See* Lafler v. Cooper, 566 U.S. 156, 174, 132 S.Ct. 1376, 182
> L.Ed.2d 398 (2012).

Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote

omitted).

The AEDPA further provides for relief if an adjudication "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d)(2). Under § 2254(d)(2), a state court decision is

based on an "unreasonable determination of the facts" if the state court's factual findings are

"objectively unreasonable in light of the evidence presented in the state-court proceeding,"

which requires review of whether there was sufficient evidence to support the state court's factual findings. *See* <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003). Within this overarching standard, of course, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, § 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. <u>Lambert v. Blackwell</u>, 387 F.3d 210, 235 (3d Cir. 2004).

## IV. <u>Discussion</u>

Petitioner raises two claims in his Petition. First, he claims that the state court's refusal to order a competency hearing or a psychiatric examination of Commonwealth witness Matthew Henkel, and its denial of his request to access Matthew Henkel's psychiatric records, violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution. Second, Petitioner claims that his trial counsel provided ineffective assistance when he advised him not to testify rendering his waiver of that right unknowing and unintelligent. Respondents concede that these two claims have been fully exhausted in the state courts and therefore are not procedurally defaulted. As such, they will be reviewed pursuant to AEDPA's extremely deferential standard of review set forth *supra*.

### A. <u>Competency and psychiatric records of Matthew Henkel</u>

Petitioner claims that he properly raised a question concerning Matthew Henkel's competency as a witness and that the trial court erred in denying a pretrial request to order Matthew to submit to a psychiatric examination, produce his psychiatric records, and produce the names of his psychiatric providers. He claims that this error impeded his ability to effectively

impeach Matthew and violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

In support of this claim, Petitioner maintains that the issue regarding Matthew Henkel's competency arose when, on September 26, 2003, it was disclosed to the Commonwealth by Anthony Mariani, Matthew Henkel's attorney, that Matthew was under the care of a psychiatrist and receiving antidepressant medication. Matthew Henkel reported that by reason of taking his medication, his memory was much clearer and he was recalling additional details, which allegedly amplified his purported knowledge as to what occurred. ADA Merrick subsequently disclosed this information to defense counsels, who immediately filed a motion to compel a psychiatric examination of Matthew Henkel, requesting that the court also order the Commonwealth to produce his medical records dealing with any mental disorder or malady for which he had received professional treatment. In their motion, defense counsels argued that there was such a conflict in Matthew's new version of what occurred in comparison to his earlier statements to authorities that it appeared as though he was either "fabricating evidence, hallucinating, or . . . imagining matters to be true because of his mental condition or his medication." They believed that his medical records showed a long history of psychiatric problems which, they contended, had a bearing on Matthew Henkel's reliability, veracity and competency to testify. (Resp't Ex. 7, ECF No. 11-2, pp.25-30.)

At a pre-trial motions hearing held on September 29, 2003, the motion was argued before Judge Manning who eventually denied the request for a psychiatric examination and production of psychiatric records but ordered the Commonwealth to provide the defense with medications Matthew Henkel was currently taking. At trial, which occurred just a couple of weeks later, Matthew denied that he was under the influence of any narcotic or drug other than what was

prescribed to him by his doctor, which was Zoloft and Zyprexa. He was asked if Zoloft had any effect on his ability to remember things or somehow enhanced his memory in any way, and he testified that it did not as far as he was aware.

On direct appeal, Appellants claimed reversible error in the trial court's refusal to order a psychiatric exam of Matthew Henkel and its refusal to order disclosure of Matthew Henkel's psychiatric records and names of treating physicians. Appellants argued that without Matthew's revived memory testimony that came to light shortly before trial, and the remainder of which was disclosed for the first time on the witness stand, the Commonwealth would have been left with a considerably weakened circumstantial case, and they claimed that it was Matthew's new "flashback" memories that provided the very foundations for their convictions for first and second degree murder. In addressing this claim in his Pa. R.A.P. 1925(a) Opinion, Judge Manning wrote the following:

> The only basis proffered by the defendants for the intrusion into the privacy of Matthew Henkel that would result in this Court order[ing] him to undergo a psychiatric evaluation or compell[ing] him to produce records of treatment is that Matthew Henkel indicated that his recollection of events improved after he underwent some counseling and therapy. Matthew Henkel testified; "My meeting on September 25th was to go over the new information that I had for the District Attorney after counseling and therapy." He later explained that the new information that he had was a result of what he described as a "flashback memory." He explained that while he was driving over a bridge in Philadelphia that was constructed similar to the bridge in Steubenville which Andrew Jones was thrown, the sound of the metal grating on that bridge brought back more precise memories of what happened. The similarity of sounds triggered a more precise recollection. When specifically asked what he meant by the term "flashback", Matthew Henkel stated, "If you have a sight or a sound or even a smell that takes you back to a memory that you have that perhaps you had problems accepting and coming in terms with."

> There is nothing in this testimony from Matthew Henkel that raised a substantial question as to his competency. He did not indicate that his more specific memories concerning the incidents in question were solely the result of any psychiatric or psychological treatment or counseling. The chief complaint of

the defendants is that he was able to provide greater detail to law enforcement shortly before trial than he was able to provide when initially interviewed. These concerns go to his credibility and not to his competence. This is not a case where a witness claims to have recovered memories from psychiatric counseling or hypnotherapy that did not exist before. The defendant simply stated that certain stimuli triggered a better recollection. Competency involves an examination of three issues: 1) the capacity of the witness to communicate, which includes both the ability to understand questions and to express intelligent answers; 2) the witness's mental capacity to observe the occurrence itself, and the capacity to remember what it is that he is called to testify about; and 3) a consciousness of the duty to speak the truth. None of these concerns are implicated in Matthew Henkel's testimony that certain events triggered better recollection of what had occurred.

The Court would also note that it is not unusual in this Court's experience for witnesses who are cooperating in exchange for not being prosecuted for crimes they are involved in to be hesitant initially in disclosing all that they know. Often, their "recall" of events improves over time as they are interrogated by law enforcement officials and prosecutors. While Mr. Henkel's improved memory was certainly fodder for cross-examination that called into question the credibility of his more recent recollections, his competency was not called into question. Accordingly, a psychiatric evaluation was not warranted. Moreover, the intrusion into his privacy that a review of his psychiatric records or even revelation of the names of the mental health professionals that treated him was also not warranted.

(Resp't Ex. 14, ECF No. 11-6, pp.21-22) (internal citations to record omitted).

On appeal, the Superior Court noted that the only way it could disturb the trial court's evidentiary ruling was for its abuse of discretion, which it did not find. In making this determination, the Superior Court first set forth the law with regard to witness competency and noted that a "trial court does not have the duty to order any investigation into a witness' competency unless the court has some doubt after observing the witness." (Resp't Ex. 33, ECF No. 14-4, p.20) (citing Commonwealth v. Counterman, 719 A.2d 284, 295 (Pa. 2000)). It also noted that "a psychiatric examination should not be ordered unless the proponent of such an examination demonstrates a 'compelling reason for the examination.'" Id. (quoting Commonwealth v. Alston, 864 A.2d 539, 549 (Pa. Super. 2004) (en banc)). In addressing

whether the trial court committed reversible error, the Superior Court set forth the following analysis:

> During a pre-trial motions hearing, appellant Henkel's counsel asserted Matthew Henkel was potentially suffering from depression and that "a depressant is very similar to a person who has Alzheimer's disease." According to appellants, Matthew had been "under the guise of proper medical care . . . and receiving antidepressant medicine" and "as a result of all of this, his memory in fact has become enhanced." In his responsive brief to the trial court's addendum, Elias argues that testimony given during the recently conducted evidentiary hearing established Matthew had been hospitalized in a mental institution three months prior to the commencement of trial and that this newly discovered information lends further credence to appellants' overall position relative to this issue. Lischner joins the argument set forth in the Elias reply brief.
>
> The trial court, after observing Matthew for a lengthy period of time, had no doubt as to his competency. At trial, Matthew stated that additional memories of the events leading up to Jones' death were triggered by the vibrations of a grated bridge over which he was traveling, which apparently sounded like the grating of the bridge over which Matthew and Elias dumped Jones' body.
>
> In denying the psychiatric examination and the records request, the trial court concluded appellants' complaints spoke to Matthew's credibility and not his competency because the thrust of the complaint was that Matthew's story became more detailed as time went on. The trial court did not find Matthew's refreshed recollection raised an issue about his competency; it noted that witness recollections often improve when triggered by external stimuli and further noted it was not unusual for witnesses who are cooperating with law enforcement to be hesitant initially in disclosing all of the information they possess.
>
> The trial court had no doubts as to Matthew's competency at the time of trial and, hence, was under no duty to order any form of mental health investigation. The only way we could disturb the trial court's ruling in this situation is if the trial transcripts gave an unequivocal indication Matthew was incompetent. They do not.
>
> In addition, appellants' attempt to equate depression with Alzheimer's disease is preposterous and troubling. Were we to sanction court-ordered psychiatric examinations every time a question is raised as to a witness' mental health treatment based on such flawed analogies, we would not only open the door to unwarranted invasions of privacy but we would also give witnesses reason to refuse or resist testifying anytime they previously had sought treatment for garden variety mental health issues.

Furthermore, while we recognize testimony at the evidentiary hearing suggested Matthew was indeed hospitalized for mental health problems three months prior to the murder trial, Elias does not point to any evidence tending to show this hospitalization impaired Matthew's ability to perceive the events leading up to Jones' murder, interfered with his ability to recall these events, rendered him unable to communicate what he perceived, or destroyed his ability to appreciate the import of giving testimony. Elias' argument makes it clear he is attacking Matthews' credibility – not his cognitive ability. . . . . Elias already was given an opportunity to impeach the credibility of Matthew; he failed in this endeavor.

We conclude the trial court did not abuse its discretion in denying appellants' request for a psychiatric examination. We have no reason to disturb the court's observations about Matthew Henkel's ability to testify and appellants' attempt to equate depression with Alzheimer's does not, in and of itself, raise a question about Matthew's competency. The argument Elias advances in his reply brief, which is joined by Lischner, fails because it is nothing more than an attack on Matthew's credibility – not his competence. Appellants were able to extensively cross-examine Matthew about the allegedly disparate stories he gave to investigators. The jury did not find Matthew's credibility was undermined during cross-examination. To afford appellants a new trial wherein Matthew can be further impeached through the use of irrelevant psychiatric records would result in a witch-hunt.

(Resp't Ex. 33, ECF No. 14-4, pp.20-21) (internal citations omitted).

As previously stated, Petitioner claims that he is entitled to habeas relief because the trial court's denial of his motion to challenge the competency of Matthew Henkel through a psychiatric examination and access Henkel's psychiatric treatment records violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution. Although Petitioner raised this claim in state court, both in his original pre-trial motion and on direct appeal, as violations of federal constitutional law,[6] his primary argument in his appellate brief was that the trial court applied the incorrect standard under Pennsylvania law when it denied the motion, and that under the correct standard, which is that the trial judge "has an **obligation** to

---

[6] He also argued that the trial judge's denial of his motion violated his rights under Article 1, Sections 1 & 9 of the Pennsylvania Constitution, dealing with Due Process and Confrontation, respectively. (Resp't Ex. 19, ECF No. 11-8, p.42.)

order an investigation of the competency of a witness if the court has **some doubt** as to competency," his motion should have been granted. (Resp't Ex. 19, ECF No. 11-8, pp.34-35) (emphasis contained within). With regard to federal law, Petitioner argued only that the trial court's ruling frustrated his rights guaranteed to him by failing to protect against the use of false testimony or testimony unreliably revived by the Due Process Clause of the Fourteenth Amendment and the Sixth Amendment Confrontation Clause. (Resp't Ex. 19, ECF No. 11-8, p.35.) When the claim was addressed on appeal, the Superior Court recognized that Petitioner was raising the claim as a violation of federal constitutional law, but the appellate court did not cite to any federal law and instead rejected the claim on state law grounds citing only to Pennsylvania's standard for when a judge has a duty to order an investigation into a witness' competency. (Resp't Ex. 33, ECF No. 14-4, p.20.)

In <u>Johnson v. Williams</u>, 133 S. Ct. 1088 (2013), the United States Supreme Court held where there is an absence of discussion of the federal constitutional claim by the state court in its decision rejecting the related state law claim, there is a rebuttable presumption that the state court adjudicated the federal constitutional claim on the merits and that § 2254(d) applies. The Supreme Court explained:

> In <u>Richter</u>, 562 U.S., —, 131 S.Ct., at 785, we held that § 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Rather, we explained, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Id.</u>, at —, 131 S.Ct., at 784-785.

> Our reasoning in <u>Richter</u> points clearly to the answer to the question presented in the case at hand. Although <u>Richter</u> itself concerned a state-court order that did not address any of the defendant's claims, we see no reason why the <u>Richter</u> presumption should not also apply when a state-court opinion addresses some but not all of a defendant's claims.

- - -

> In sum, because it is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked, we see no sound reason for failing to apply the <u>Richter</u> presumption in cases like the one now before us. When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits–but that presumption can in some limited circumstances be rebutted.

<u>Johnson</u>, 133 S. Ct. at 1094, 1096.

Neither Petitioner nor Respondents have adequately addressed how this Court is to review this claim apart from just a passing reference or a summary recitation of the § 2254(d) standard without any application to the facts of this case. Petitioner, essentially, just challenges the state court's application of state law and cites to United States Supreme Court cases only for the general proposition that the Due Process and Confrontation Clauses prohibit the admissibility of false and unreliable evidence against an accused. (ECF No. 31, pp.16, 17, 19.) Assuming this Court were to find that the Superior Court adjudicated Petitioner's federal constitutional claims on the merits, and that § 2254(d) applies, Petitioner has definitely not demonstrated that the Superior Court's decision was contrary to, or an unreasonable application of clearly established federal law.

If, however, this Court were to find that the Superior Court did not adjudicate the merits of Petitioner's federal constitutional claims, even under a *de novo* standard of review they still fail.[7] Petitioner has not shown that the trial judge's denial of the defendants' motion to compel Matthew Henkel to submit to a psychiatric examination, and access his psychiatric treatment

---

[7] If the state court did not "adjudicate [ ] a claim on the merits," § 2254(d)'s standard of review does not apply and the federal habeas court applies a *de novo* review to the claim. *See*, *e.g.*, <u>Thomas v. Horn</u>, 570 F.3d 105, 124 (3d Cir. 2009). If the state court misconstrues the federal claim, and, as a result, does not adjudicate it on the merits, then § 2254(d) does not apply. *See*, *e.g.*, <u>Appel v. Horn</u>, 250 F.3d 203, 209-12 (3d Cir. 1999).

records, violated his rights under the United States Constitution.  Notwithstanding the fact that Petitioner's claim is ultimately a challenge to the trial judge's evidentiary ruling, and, in general, alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas relief, Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (Federal courts reviewing habeas claims cannot "reexamine state court determinations on state-law questions."); Wilson v. Vaughn, 533 F.3d 208, 213 (3d Cir. 2008), such evidentiary rulings can violate due process if they are so egregious that they result in a denial of fundamental fairness.  *See* Biascia v. Attorney Gen. of New Jersey, 623 F.2d 307, 312 (3d Cir. 1980), *cert. denied*, 449 U.S. 1042 (1980) ("evidentiary errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial").  The Supreme Court has stated that a state court evidentiary ruling can rise to the level of a due process violation if "'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  Montana v. Egelhoff, 518 U.S. 37, 43 (1996) (quoting Patterson v. New York, 432 U.S. 197, 201-02 (1977) (citations omitted).  The Supreme Court, however, has "defined the category of infractions that violate 'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352 (1990) (citing United States v. Lovasco, 431 U.S. 783, 790 (1977)).  Courts are to determine only whether the complained of action "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' Mooney v. Holohan, 294 U.S. 103, 112 (1935), and which define 'the community's sense of fair play and decency,'" Rochin v. California, 342 U.S. 165, 173 (1952)."  Lovasco, 431 U.S. at 790.

First, the trial judge's denial of the psychiatric examination of Matthew Henkel and records requests did not deprive Petitioner of his due process rights because the procedures

followed by the trial court were fundamentally fair. "Although the Confrontation Clause guarantees a defendant the right to be confronted with the witnesses against him, U.S. Const. amend. VI, and this right includes as one of its elements that those witnesses be competent to testify, Maryland v. Craig, 497 U.S. 836, 851 (1990), the right does not necessarily guarantee a defendant a hearing on a witness's competence to testify." Moreland v. Bradshaw, 699 F.3d 908, 922 (6th Cir. 2012). The Supreme Court has recognized that requirements for competency determinations vary by state, see Kentucky v. Stincer, 482 U.S. 730, 742 n.12 (1987), and under Pennsylvania law, a witness is presumed competent and "the determination of testimonial competency rests in the sound discretion of the trial court." Commonwealth v. Koehler, 737 A.2d 225, 239 (Pa. 1999) (citing Commonwealth v. Counterman, 719 A.2d 284 (Pa. 1998)). A trial judge has no duty to order any form of mental health investigation unless the judge has "some doubt" after observing the witness. Id. (citing Counterman, 719 A.2d at 295).

During the pre-trial motions hearing, the trial judge heard arguments from the parties and ultimately concluded that the defendants' complaints spoke to Matthew's credibility, not competency. While Judge Manning did state that there was nothing in Matthew Henkel's testimony that "raised a substantial question as to his competency," (Resp't Ex. 14, ECF No. 11-6, p.21), which Petitioner maintained was the wrong standard under Pennsylvania law, Judge Manning's Opinion made clear, as noted by the Superior Court on appeal, that he had no doubts as to Matthew's competency and therefore no duty to order any mental health investigation, (Resp't Ex. 33, ECF No. 14-4, p.21). The state court in this case appropriately relied on Pennsylvania state law when it determined that there was no doubt as to Matthew's ability to testify and Petitioner has not shown that the procedures followed by the trial court in coming to its decision were in any way fundamentally unfair as to violate due process.

Furthermore, there was no denial of Petitioner's right to confrontation because his attorney was afforded the opportunity to cross-examine Matthew Henkel in front of the jury.  As the Supreme Court has consistently held, "'[T]he Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.'"  United States v. Owens, 484 U.S. 554, 559 (1988) (quoting Kentucky v. Stincer, 482 U.S. 730, 739 (1987) (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985))) (emphasis added by Owens).  Even assuming, *arguendo*, that Matthew Henkel's statements given to authorities shortly before trial in September 2003, which formed the basis for the defenses' motion to compel psychiatric examination and production of psychiatric records, were influenced by reason of his taking medication, such fact did not render him "unavailable" within the meaning of the Sixth Amendment for purposes of a Sixth Amendment violation.

In sum, Petitioner has not shown that he is entitled to relief under § 2254(d), or that the trial judge's denial of the psychiatric examination and records request for Matthew Henkel in order to challenge his competency to testify violated his federal constitutional rights; and, to the extent that he argues that the state courts' decision violated state law, the claim is not cognizable on federal habeas review.

## B.  Ineffective assistance of counsel

Petitioner next argues that his trial counsel, Mr. George, was ineffective for advising him against testifying at trial, so much so that it vitiated a knowing and intelligent waiver of that right,[8] and he claims that the state courts' decision finding otherwise was objectively

---

[8] The Court notes that Petitioner's claim is something of a hybrid.  He does not allege that the Commonwealth deprived him of his right to testify, which is the normal scenario in a right to

unreasonable and contrary to clearly established federal law. Specifically, he claims that Mr. George's advice against testifying was unreasonable because Mr. George repeatedly promised the jury in his opening statement that Petitioner would testify, and, because Mr. George did not explain to him that Bruce Henkel, Sr.'s testimony could only be used to impeach Matthew Henkel and not as positive evidence that Matthew actually did the killing. He maintains that he would have testified to rebut Matthew Henkel's testimony had Mr. George explained to him the difference between impeachment evidence and substantive evidence, and he argues that without him testifying there was no evidence presented that he did not kill Andrew Jones. As it relates to this claim, the Court will recount the following background.

### 1. Relevant Procedural Background

#### a. Pretrial and Trial Proceedings

Early during trial preparation, Petitioner and his counsel, Mr. George, decided that Petitioner would testify in his own defense to rebut Matthew Henkel's expected testimony that Petitioner killed the victim, Andrew Jones. In making his opening statement, Mr. George told the jury that Petitioner was going to testify and explain what happened on the day in question; specifically, that Petitioner was not present at the apartment when Matthew Henkel killed Andrew Jones and that when Petitioner returned to the apartment he found that Matthew Henkel had already killed Jones.

Late in the trial, it was revealed that Matthew's father, Bruce Henkel, Sr., and his brother Bruce Henkel, Jr., would testify on behalf of Jared Henkel and offer contrary testimony to the

---

testify clam. *See, e.g.*, <u>Rock v. Arkansas</u>, 483 U.S. 44, 61 (1987) (holding that state's evidentiary rules interfered with criminal defendant's right to testify on his or her own behalf). Rather, it is that his trial counsel's ineffective assistance rendered the waiver of that right unknowing and unintelligent.

Commonwealth's case by divulging inculpatory statements that Matthew had made to them. The trial court allowed the testimony but only for the limited purposes of impeaching Matthew because their statements were hearsay that did not fall under an exception to the hearsay rule. The trial court even permitted defense counsel for Jared Henkel to recall Matthew Henkel for the sole purpose of confronting him with these statements to establish their admissibility as prior inconsistent utterances. Immediately after Matthew and his brother, Bruce Henkel, Jr., testified, the trial court, *sua sponte*, instructed the jury that the testimony by Matthew's brother and father could only be used to impeach Matthew's credibility, and not as substantive evidence. Following the testimony of Bruce Henkel, Sr., Jared Henkel rested. Mr. George then asked for a five-minute recess to go to the bathroom and announced in full hearing of the jury that Petitioner would testify after the break. However, when the court reconvened, which was quite a while later, Mr. George informed the judge that Petitioner was no longer going to testify and that the defense was going to rest. Before permitting the close of testimony, though, the trial judge conducted a full colloquy into the decision not to testify made by Petitioner and the other two defendants, and informed the parties that a no adverse inference instruction would be given to the jury. When the jury returned from recess, the trial judge again instructed that the testimony of Bruce Henkel, Sr. could be used only for impeachment of Matthew Henkel. At that time, Petitioner rested without testifying, followed by Jared Lischner.

### b.  Direct Appeal Proceedings

On direct appeal, Petitioner argued that the trial court's refusal to admit Matthew Henkel's alleged confession to his father as substantive evidence, and not merely for impeachment purposes, was improper. In addressing this claim in his Pa. R.A.P. 1925(a) Opinion, Judge Manning wrote the following:

. . . This testimony was admissible only because it contradicted earlier testimony from Matthew Henkel. It was properly admitted for its impeachment value but could not be considered by the jury as substantive evidence. The statements attributed to Matthew Henkel by his brother and his father were hearsay. They were out of court statements offered for the truth of the matter asserted. As such, they were not admissible unless they fell under an exception to the hearsay rule. They did not. Although counsel argued that they were statements against penal interest, that exception to the hearsay rule is only applicable when the declarant is unavailable. Pa. R.E. 804(b)(30).

(Resp't Ex. 14, ECF No. 11-6, p.34.) Judge Manning also pointed out that, while under Pa. R.E. 803.1, a prior inconsistent statement may be offered as substantive evidence if it meets additional requirements of reliability, "[t]he statement purportedly made by Matthew Henkel to his father was clearly not given under reliable circumstances. It was not recorded, written and not even revealed until 18 months after it was allegedly made. . . . The testimony was offered by the father of a defendant on trial for criminal homicide. The circumstances make the statement among the most unreliable." Id., p.35. In its Memorandum Opinion dated November 14, 2007, the Superior Court agreed with Judge Manning and also noted that admitting Matthew's alleged confession for substantive purposes would have had no affect on the outcome of his case. In coming to this conclusion, the Superior Court stated that

> [f]or the confession to have had any impeachment value, the jury would have had to believe the confession was given and was true. The jury's verdict makes it clear it did not harbor such a belief. If the jury did not believe the confession was given and the confession was true, admitting the confession for substantive purposes would have been of little value to the defense. The trial court did not abuse its discretion in admitting Matthew's alleged confession for impeachment purposes only.

(Resp't Ex. 33, ECF No. 14-4, p.23); Commonwealth v. Henkel, et al., 938 A.2d 433, 444 (Pa. Super. Ct. 2007).

### c. **PCRA Proceedings**

In his PCRA petition, Petitioner claimed that Mr. George was ineffective because he failed to explain the difference between impeachment and substantive evidence during the court's "very brief" recess and that had Mr. George done so then he would have insisted on testifying knowing that Bruce Henkel, Sr.'s testimony could not be used as substantive evidence that Matthew was the one who killed Jones. He also argued that Mr. George provided ineffective assistance by advising him not to testify after repeatedly promising the jury in his opening statement that Petitioner would testify and establish a defense. He further claimed that based on the totality of the circumstances, Mr. George had no reasonable basis for advising him not to testify and that his waiver of his right to testify was rendered unknowing and unintelligent based on Mr. George's constitutionally deficient performance. On January 31, 2011, the PCRA court had a hearing solely on this claim.

At the PCRA hearing, Mr. George testified at length. He testified that on the day the Commonwealth rested, he was advised by Jared Henkel's lawyer, Mr. Ceraso, that Bruce Henkel, Sr. would testify that Matthew admitted to him that he killed Andrew Jones because Jones had teased Matthew about being gay.[9] Bruce Henkel, Jr. would corroborate Bruce Henkel Sr.'s story by testifying that Matthew told him in a phone conversation that if Jones did not stop teasing him about being gay, he would kill him.

Mr. George also testified that it was the revelation that Bruce Henkel, Sr. and his son were going to testify that caused him to reconsider calling Petitioner to the stand. Mr. George explained that during the recess he spoke with Petitioner and Petitioner's family, which included

---

[9] According to Mr. Ceraso, this information was revealed to him by Bruce Henkel, Sr. for the first time approximately forty-eight hours earlier.

his mother, father and an uncle, and he explained to them that Mr. Henkel, Sr. was going to testify and what he was going to testify to. Mr. George testified that after that discussion "we came to the decision that he [Petitioner] was not going to testify." Mr. George also testified that he spoke with Petitioner alone stating that they went over the testimony in detail and felt that it was in Petitioner's best interest for him not to testify. When asked if he told Petitioner that he felt that they had what they needed regarding impeachment and substantive evidence, Mr. George responded:

> Well, it was a lot more involved. That was an over-simplification. We went over the testimony in detail, and like I said, it was not only with my client, it was with his parents and his uncle. And after we heard the testimony, we felt it would be in his best interest for him not to testify.

(Resp't Ex. 50, ECF No. 15-9, p.22) (internal citation to record omitted). When asked the basis for his decision and advice to Petitioner, Mr. George said,

> I don't know if I felt that I had what I needed. Under the circumstances, when Mr. Henkel, Sr. testified and basically told the jury that his son was the one that committed the homicide, we felt it was pretty strong evidence with relationship to the defense of all three of the defendants that were charged with the crime.

(Resp't Ex. 50, ECF No. 15-9, p.22) (internal citation to record omitted). He also confirmed that he believed the testimony of Bruce Henkel, Sr. would ". . . allow . . . the argument that [his] client was exonerated by that testimony. . . ." (Resp't Ex. 50, ECF No. 15-9, p.23) (internal citation to record omitted).

Petitioner also testified at the PCRA hearing and Judge Manning, writing for the PCRA court, summarized his testimony as follows:

> [Petitioner] said that he met several times with his counsel prior to trial regarding strategy and it was always his intention to testify on his own behalf. He stated that after Bruce Henkel, Sr., and Jr. testified, he had a conversation with Mr. George regarding testifying and Mr. George told him, ". . . we had what we needed." He took this to mean that he would be acquitted of the homicide. He

confirmed that he made the decision not to testify, but did so in reliance on Mr. George's advice that he should not testify because they "had what they needed." The defendant testified that the discussion he had with his attorney was "very brief." He said that during that brief discussion there was no explanation to him about the difference between impeachment evidence and substantive evidence. Had [Petitioner] been advised that Bruce Henkel, Sr.'s testimony about what Matthew Henkel said could only be used to impeach Matthew Henkel and not as positive evidence that Matthew actually did the killing, he would have testified to rebut Matthew Henkel's testimony.

During cross examination, [Petitioner] stated that the only discussion he had with his attorney was brief, took place in the courtroom and occurred as soon as his attorney returned from the restroom. He claimed that all that Mr. George told him was, ". . . I don't think you should get up there . . . because we had what we needed." He denied discussing it any longer than a "few seconds inside the courtroom." He acknowledged that he engaged in a colloquy with this Court during which he advised the Court that he understood that the decision whether or not to testify was his; that he had the right to not testify and that he had the right to counsel's advice as to whether or not to testify.

(Resp't Ex. 50, ECF No. 15-9, p.24) (internal citations to record omitted).

The PCRA court ultimately concluded that Petitioner had failed to establish, at the hearing and on his PCRA petition, that Mr. George "provided advice so unreasonable as to render [Petitioner's] decision [not to testify] involuntary[,]" and that Petitioner was not prejudiced by the fact that Mr. George indicated in his opening that his client would testify. (Resp't Ex. 50, ECF No. 15-9, pp.31-32.) In so finding, the PCRA court stated the following:

The defendant invoked his right to remain silent. He did so, according to the colloquy this Court conducted in court with him and his co-defendants, knowing that he had the right to testify, knowing that he had the right to not testify, knowing that exercising that right could not be used against him and knowing that the decision to testify was solely his to make in consultation with his attorney. Clearly, the evidence presented at the hearing revealed no evidence that the defendant was denied his right to testify due to counsel's interference with that right. The defendant did not make that claim. The question then becomes whether the advice that counsel provided regarding the right to testify was so unreasonable as to render the decision to forgo testifying involuntary. It remained the defendant's burden in this proceeding to prove what specific advice was given to him regarding the decision on whether to testify *and* that the advice was so unreasonable as to render his decision involuntary.

28

* * * * *

According to the defendant here, the advice that Mr. George gave him that led to his decision not to testify was that counsel told him that we "had what we needed" from the testimony of Bruce Henkel, Sr. He said that his discussion was "very brief" and that there was no discussion of the difference between substantive evidence and impeachment evidence regarding the testimony of Bruce Henkel, Sr. and that had he known it was only to be considered for impeachment purposes, he would have testified.

It is important to note that the defendant did not claim that Mr. George ever specifically **told him** that Bruce Henkel, Sr.'s testimony was admissible as substantive evidence. He said that they never discussed whether that testimony could be used as substantive and impeachment evidence. Moreover, at the PCRA hearing, PCRA counsel asked neither the defendant nor his trial attorney if that specific advice was given.

Although PCRA counsel tried to suggest that when trial counsel advised the defendant that he thought that they "had what they needed" from the testimony of Bruce Henkel, Sr. he meant that that testimony could be used substantively to prove that Matthew Henkel killed the victim, trial counsel disputed this, referring to it as an "over-simplification." Trial counsel said that he discussed Bruce Henkel's testimony in detail with the defendant, his parents and his uncle and that, based on that discussion, Mr. Elias agreed that it was not in his interest to testify.

PCRA counsel seemed to avoid asking either the defendant or his trial counsel directly whether that specific advice was given. Although in this proceeding the defendant bears the burden of establishing the facts to support his claims, the three other people involved in the discussions about whether the defendant should testify, his parents and his uncle, were not called to testify. Had they heard trial counsel give that specific advice during the lengthy discussions trial counsel described, they certainly would have been called to testify.

Defense counsel's advice that the testimony of Bruce Henkel gave the defense the opportunity to argue that the defendant did not commit the murder was accurate and not wholly unreasonable. If believed, Bruce Henkel's testimony would have impeached the testimony of the only witness that said that Craig Elias killed Andrew Jones, Matthew Henkel. While it may not have allowed the jury to conclude that Matthew Henkel killed Andrew Jones, that was not a conclusion that the jury had to reach in order to return a verdict of not guilty. The defendant did not have the burden at trial to prove who, in fact, killed Andrew Jones. The only burden was on the Commonwealth and any evidence that called into question

the credibility of the Commonwealth's key witness had the potential of being "all that [the defendant] needed."

It must be remembered that Matthew Henkel was the only Commonwealth witness that offered any evidence tending to show that this defendant killed Andrew Jones and that the killing was done with the agreement of the other defendants. Matthew Henkel's credibility was of vital importance. The testimony of Bruce Henkel, Sr. and Bruce Henkel, Jr., although only admitted as impeachment evidence, went to this important determination. This Court does not believe that it was unreasonable for counsel to advise his client that the impeachment value of the testimony of Bruce Henkel provided the defendant with what they "needed" with regard to damage and credibility of Matthew Henkel.

It is also important to note the difference between Mr. George's description of the conversations he had with his client and that of his client. Mr. George testified that he had lengthy discussions with the defendant during which his family members were present. That comports with this Court's recollection that the recess that took place after Mr. George indicated that he would call his client lasted several hours. Trial counsel agreed that the recess was that long. Patrick Thomassey, trial counsel for Jared Lischner, also agreed that the recess was longer than the "brief recess" described by the defendant, stating: "I don't know how long it was. It was long." The defendant, on the other hand, testified that his discussion with Mr. George took "seconds" and occurred in the Courtroom immediately before he was supposed to testify. The defendant's testimony in this regard is wholly incredible. The recess, during which the defendant, his family and his attorney discussed whether or not he should testify, lasted at least two hours. This also calls into question the defendant's credibility regarding the content of those discussions. The defendant only recalled being told that "we have what we need." Defense counsel, however, described a lengthy discussion with the defendant and his family during which he reviewed, at length, the testimony of Bruce Henkel, Sr. and discussed why he thought that testimony provided them with what was needed to argue that the Commonwealth failed to meet its burden. The testimony of counsel in this regard is credible; the testimony of the defendant is not.

It is well settled that a defendant who makes a knowing, voluntary and intelligent waiver of testimony, may not later claim ineffective assistance of counsel caused him to decide not to testify. Commonwealth v. Fletcher, 750 A.2d 261, 275-75 (Pa. 2000). The defendant did not establish, at the hearing on his PCRA Petition, that counsel provided advice so unreasonable as to render his decision involuntary. Counsel's advice that the testimony of Bruce Henkel, Sr., which, if believed by the jury, would have impeached the testimony of the only Commonwealth witness with direct knowledge that the defendant killed the victim, was not unreasonable, based on the evidence presented at the PCRA hearing.

The Court has also considered the fact that defense counsel, in his opening statement, advised the jury that his client would testify and would contradict Matthew Henkel's testimony. The jury was instructed, however, that opening statements and closing arguments were not evidence. They also were instructed that the defendants had an absolute right not to testify and that their decision to exercise that right could not be used against them.

A jury is presumed to follow the instructions of the Court and, therefore, it must be presumed that they did so in this case and did not consider what counsel said in his opening as evidence nor use the fact that the defendant chose not to testify against him. The jury did hear evidence that suggested that Matthew Henkel was not being truthful in his testimony implicating the defendant, which is essentially what defense counsel said the defendant would say if he testified. The defendant was not prejudiced by the fact that trial counsel indicated in his opening that the defendant would testify.

(Resp't Ex. 50, ECF No. 15-9, pp.25-33) (footnote and internal citations to record omitted)

On appeal, the Superior Court agreed with the "thorough and well-reasoned" opinion of the PCRA court. It also addressed Petitioner's claim that the PCRA court failed to apply the correct standard when it found that Mr. George did not give Petitioner wholly unreasonable advice that rendered his decision not to testify "involuntary". Petitioner claimed that the correct standard was whether counsel's advice was "so unreasonable as to vitiate a knowing and intelligent decision" to testify on one's own behalf. (Resp't Ex. 58, ECF No. 16-7, at p.6, FN1) (citing Commonwealth v. Nieves, 746 A.2d 1102, 1104 (Pa. 2000)). However, the Superior Court disagreed with Petitioner stating that "[a]dvice that 'vitiates a knowing and intelligent decision' is the same concept as advice that renders the decision 'involuntary.' An unknowing and [un]intelligent decision is one that is not voluntary. The PCRA court merely rephrased the pertinent principle." (Resp't Ex. 58, ECF No. 16-7, at p.6, FN1.)

## 2. **Clearly established Federal law**

As an initial matter, the "clearly established Federal law," 28 U.S.C. § 2254(d), in which to analyze Petitioner's claim is set forth by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). "'[C]learly established federal law' means 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Dennis v. Sec'y, Pennsylvania Dep't of Corr.</u>, 834 F.3d 263, 280 (2016) (*en banc*) (quoting <u>Lockyer v. Andrade</u>, 358 U.S. 63, 71-72 (2003)). It "includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" <u>White v. Woodall</u>, 134 S. Ct. 1697, 1702 (2014) (quoting <u>Howes v. Fields</u>, 132 S. Ct. 1181, 1187 (2012), which quoted <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000)).

Under <u>Strickland</u>, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different. 466 U.S. at 687. For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." <u>Id</u>. at 688. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694.

## 3. **The state courts' decision was not contrary to clearly established Federal law**

At the outset, the Court notes that the state courts' decision on Petitioner's ineffective assistance of counsel claim is not "contrary to" clearly established federal law because the state courts properly identified and applied the reasonableness standard and standard for finding

prejudice as outlined by the Supreme Court in Strickland.[10]  *See* (Resp't Ex. 14, ECF No. 11-6, pp.35-36) (citing Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 2001)); (Resp't Ex. 50, ECF No. 15-9, p.24 (citing Commonwealth v. Breisch, 719 A.2d 352, 355 (Pa. Super. Ct. 1988)); (Resp't Ex. 58, ECF No. 16-7, p.5 (citing Commonwealth v. Michaud, 70 A.3d 862, 867 (Pa. Super. Ct. 2013)).  *See also* Werts, 228 F.3d at 202-04 ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted Strickland and thus was not 'contrary to' established Supreme Court precedent.").

Petitioner could argue the second sense of "contrary to," *i.e.*, the state court reached a different result from that of the United States Supreme Court on a set of materially indistinguishable set of facts.  *See, e.g.*, Williams v. Taylor, 529 U.S. 362, 405 (2000).  However, instead of citing Supreme Court cases, he argues that lower federal courts have granted habeas corpus relief "in the very same situation found in the instant case, render[ing] the state courts' decision here in violation of clearly established federal law."  (ECF No. 31, p.12.)  He directs this Court's attention to several court of appeals cases that have addressed the circumstances under which counsel's failure to fulfill a promise made in an opening statement violates the Strickland standard.  The decisions issued by these courts, however, are not clearly established for the purposes of § 2254(d)(1) because they do not issue from the Supreme Court.  *See* Dennis, 834 F.3d at 280.  The Supreme Court "has repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court'" under § 2254(d)(1).  Glebe v. Frost, 135 S. Ct. 429, 431 (2014) (per curiam) (citing Lopez v. Smith, 135

---

[10] Although Pennsylvania courts typically articulate a three-prong test for gauging ineffective assistance claims, and Strickland sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts.  *See* Werts v. Vaughn, 228 F.3d 178, 202-03 (2000).

S. Ct. 1, 4-5 (2014) (per curiam)). Additionally, "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced.'" Woodall, 135 S. Ct. at 4 (quoting Marshall v. Rodgers, 133 S. Ct. 1446, 1451 (2013) (per curiam)).

The Supreme Court has never specifically addressed the circumstances under which counsel's failure to fulfill a promise made in an opening statement to call a witness violates the Strickland standard. Therefore, there is no "clearly established Federal law" on this exact issue, and thus Petitioner cannot show that the state courts' decision here was "contrary to clearly established Federal law," as he argues. The next issue the Court must consider, then, is whether the state courts' decision was an "unreasonable application of" Strickland.

### 4. The state courts' decision was not an unreasonable application of clearly established Federal law

A federal court may grant relief under 28 U.S.C. § 2254(d)'s "unreasonable application" clause if a state court has unreasonably applied the governing legal principle to the facts of the case. Williams v. Taylor, 529 U.S. 362, 413 (2000). The state court's decision must be "more than incorrect or erroneous" – it "must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75 (2003). A decision is not objectively unreasonable if "fairminded jurists could disagree" as to its correctness. Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Furthermore,

> [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland,* 466 U.S.] at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance,* 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S.Ct. at 1420. Federal habeas

> courts must guard against the danger of equating unreasonableness
> under *Strickland* with unreasonableness under § 2254(d). When § 2254(d)
> applies, the question is not whether counsel's actions were reasonable. The
> question is whether there is any reasonable argument that counsel
> satisfied *Strickland*'s deferential standard.

Harrington, 562 U.S. at 88-89. As such, this Court's review of the state courts' application of

Strickland's deficiency element to Petitioner's claim is "doubly deferential," requiring a "highly

deferential look at counsel's performance through the deferential lens of § 2254(d)." Cullen v.

Pinholster, 563 U.S. 170, 190 (2011) (internal citation and quotation marks omitted). Given this

doubly deferential review, this Court cannot say that the state courts unreasonably applied

Strickland here.

As set forth above, the Supreme Court has never specifically addressed the circumstances

under which counsel's failure to fulfill a promise made in an opening statement to call a witness

violates the Strickland standard, and federal courts that have addressed this issue have reached

different results. In this situation, the Third Circuit has stated that "decisions of federal courts

below the level of the United States Supreme Court may be helpful to us in ascertaining the

reasonableness of a state courts' application of clearly established United States Supreme Court

precedent, as well as 'helpful amplifications of that precedent.'" Marshall v. Hendricks, 307

F.3d 36, 71 n.24 (3d Cir. 2002) (quoting Matteo v. Superintendent, SCI Albion, 171 F.3d 877,

890 (3d Cir.) (*en banc*), *cert. denied*, 528 U.S. 824 (1999)); *see also* O'Brien v. Dubois, 145 F.3d

16, 25 (1st Cir. 1998) ("[T]o the extent that inferior federal courts have decided factually similar

cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the

state court's treatment of the contested issue."). Thus, the question now becomes whether the

state courts' adjudication of this claim was an "unreasonable application" of Strickland taking

into account the decisions of federal courts that have addressed circumstances somewhat similar to the present case.

Some federal courts evaluating a defense counsel's failure to fulfill a promise made in an opening statement to call a witness have concluded that such conduct amounts to ineffective assistance of counsel. In fact, Petitioner claims that two of those cases are directly on point. First, he cites to <u>Anderson v. Butler</u>, 858 F.2d 16 (1st Cir. 1988), wherein the First Circuit, applying the <u>Strickland</u> standard *de novo*,[11] held that a state court prisoner was entitled to habeas corpus relief where his counsel, after telling the jury in his opening statement that they would testify, failed to call two expert witnesses (a psychiatrist and a psychologist) who would have opined as to the petitioner's mental state at the time of the offenses. The court pointed out that counsel's error was magnified by the following factors: although he failed to call the expert witnesses, counsel continued to assert his client's mental condition as his principle defense; it was only a two day trial and so the promise was broken soon after it was made; during *voir dire*, the jurors had been asked about their thoughts on psychiatric testimony; and in his closing argument, counsel further highlighted the issue by stating his reasons for not having called the promised experts to testify. <u>Id</u>. at 17, 19. In concluding that counsel's broken promise had irreparably damaged the defense's case, the court noted that "[t]he first thing that the ultimately disappointed jurors would believe, in the absence of some other explanation, would be that the doctors were unwilling, viz., unable, to live up to their billing. This they would not forget." <u>Id</u>. at 17.

---

[11] Importantly, this case pre-dated the enactment of the AEDPA, and, therefore, the federal habeas court's review was *de novo* rather than the deferential standard required by the AEDPA. *See* <u>Jacobs v. Horn</u>, 395 F.3d 92, 100 (3d Cir. 2005) (citing <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001)).

Petitioner also cites to <u>Ouber v. Guarino</u>, 293 F.3d 19 (1st Cir. 2002), wherein the First Circuit came to the same conclusion and held that defense counsel's decision to withhold the defendant's testimony after promising the jurors during opening statement that they would hear it constituted ineffective assistance of counsel. The court emphasized the unique circumstances presented in <u>Ouber</u>, <u>id</u>. at 20, namely: that defense counsel had represented defendant twice before (both previous trials resulted in mistrials) and in each previous trial defendant had testified; and, that during defendant's third trial defense counsel introduced the testimony of twenty-four character witnesses who attested to defendant's reputation for veracity and thus set the stage for defendant's testimony by buttressing her credibility. Having laid an elaborate foundation for defendant's testimony only to withhold it subsequently, the court concluded, "in the absence of unforeseeable events forcing a change in strategy, the sequence constituted an error in professional judgment." <u>Id</u>. at 27.

Other federal courts have found ineffective assistance of counsel under similar circumstances. *See*, *e.g.*, <u>United States ex rel. Hamptom v. Leibach</u>, 347 F.3d 219, 258 (7th Cir. 2003) (counsel's performance was objectively unreasonable where counsel told the jury in his opening statement that defendant would testify about the circumstances of the alleged offense, but then declined to call the defendant to the witness stand for reasons that were apparent at the time he made his opening statement; sufficient prejudice where sole evidence against the defendant was other eyewitness testimony, and defense counsel's opportunity to contradict and cast doubt on that testimony was critical to the defense); <u>Harris v. Reed</u>, 894 F.2d 871, 879 (7th Cir. 1990) (finding counsel's performance deficient and sufficiently prejudicial where counsel promised the jury evidence that another suspect committed the crime and then failed to call any defense witnesses without explanation to the jury as to the change in strategy).

In each of these cases, "defense counsel made a specific promise to the jury to present important evidence, such as the defendant's testimony or other evidence central to the defense. And, in each case, defense counsel made an about-face by declining to present the promised evidence in the absence of unforeseen circumstances that would have justified the change in strategy." Mann v. Ryan, 774 F.3d 1203, 1213 (9th Cir. 2014) (internal citations omitted), *on reh'g en banc*, 828 F.3d 1143 (9th Cir. July 15, 2016) (citing Ouber, 293 F.3d at 28, 29; Hampton, 347 F.3d at 258; Harris, 894 F.2d at 877-78). Another court similarly granted habeas relief after concluding that defense counsel's "failure to present the promised testimony [could not] be chalked up to unforeseeable events." Madrigal v. Yates, 662 F.Supp.2d 1162, 1184 (C.D. Cal. 2009).

However, even in Ouber, a case relied on by Petitioner, the First Circuit observed that "unexpected developments sometimes may warrant changes in previously announced trial strategies." 239 F.3d at 29. In fact, in McAleese v. Mazurkiewcz, 1 F.3d 159 (3d Cir. 1993), which is the only Third Circuit case to somewhat address this issue, the circuit ultimately reversed the district court's grant of habeas relief by concluding that counsel's mid-trial decision not to call the alibi witness was a "reasoned, strategic decision" in light of the trial court's refusal to limit the scope of cross-examination of the alibi's telephone conversation with the petitioner. Id. at 165, 168.[12]

---

[12] This Court notes that the Third Circuit's language in McAleese is somewhat conflicting. For example, the court stated that "[t]he failure of counsel to produce evidence which he promised to the jury during his opening statements that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel." 1 F.3d at 166. However, in so stating, the Third Circuit cited to Harris, 894 F.2d at 879, and Anderson, 858 F.2d at 18-19, both of which had very different facts and neither of which presumed that a broken promise, in and of itself, amounted to ineffective assistance of counsel. Furthermore, later in McAleese, the Third Circuit observed that while counsel did not make any such promise to call the alibi

Other federal courts have also concluded that failing to present a witness promised to a jury in an opening is not always an error of constitutional dimension. *See, e.g.*, <u>Caldwell v. Lewis</u>, 414 F. App'x 809, 823-24 (6th Cir. 2011) (denying habeas relief on petitioner's claim that his defense counsel was ineffective for failing to introduce the alibi evidence that he promised in his opening statement because his decision not to call the alibi witnesses was a "deliberate, strategic choice that such testimony would not be beneficial"); <u>Harrison v. Motley</u>, 478 F.3d 750, 758-59 (6th Cir. 2007) (holding that defense counsel was not ineffective when he failed to call alibi witnesses he alluded to during opening statement because it was the "product of an informed, deliberate decision" due to allegations of misconduct by the witnesses and their recanting and inconsistent testimony); <u>Williams v. Bowersox</u>, 340 F.3d 667, 672 (8th Cir. 2003) (holding that the state court did not unreasonably apply <u>Strickland</u> by rejecting a claim of ineffective assistance of counsel when counsel told the jury during opening statements that he would produce the testimony of certain witnesses and two of the witnesses were never called after counsel's reconsideration once the trial was underway); <u>United States ex rel. Schlager v. Washington</u>, 887 F.Supp. 1019, 1026-27 (N.D. Ill. 1995), *aff'd* 113 F.3d 763 (7th Cir. 1997) (in distinguishing <u>Harris v. Reed</u>, 894 F.2d 871, 879 (7th Cir. 1990), and <u>Anderson v. Butler</u>, 858 F.2d 16, 17-19 (1st Cir. 1988), the court found that defense counsel made a strategic decision, with significant input from petitioner, not to fulfill the promises made in his opening statements

---

witness, even if he had made such a promise, his later decision not to call the alibi witness would not necessarily be ineffectiveness. <u>Id</u> at 167. Therefore, the Court finds that <u>McAleese</u>, a pre-AEDPA case, actually supports the position that a broken promise made to a jury to present certain testimony does not always amount to ineffective assistance of counsel, if, for example, such a decision is supported by unforeseen circumstances or developments that justified the change in strategy. In any event, this Court rejects a *per se* rule that unfulfilled promises made by defense counsel during opening statements will automatically result in a finding of deficient performance of counsel and prejudice to a defendant.

to put petitioner and another witness on the stand because as the trial progressed "it became painfully clear" that the testimony of petitioner and the witness was no longer a strategically sound decision).

Similarly, some courts that have specifically addressed the question of whether it is reasonable *to advise a defendant not to testify* after having promised the testimony in opening statements have concluded that such conduct by counsel is not, in and of itself, deficient. *See, e.g.*, Bahtuoh v. Smith, 855 F.3d 868, 872-73 (8th Cir. 2017) (declining to conclude that the state court's application of Strickland was objectively unreasonable because defense counsel's advice to petitioner not to testify, despite counsel's previous statements to the jury, was due to a change in strategy based on unexpected developments of which the state court considered when it assessed the reasonableness of defense counsel's change in strategy); Pray v. Farwell, 620 F. App'x 561, 563-64 (9th Cir. 2015) (finding that defense counsel's decision not to call his client to testify (even after promising the jury that he would) was strategic and within an objective standard of reasonableness because much of what his client was going to testify to in support of his defense was introduced via the testimony of the investigating officers); Yancey v. Hall, 237 F.Supp.2d 128, 133-35 (D. Mass. 2002) (concluding it was not ineffective assistance for petitioner's attorney to promise petitioner would testify and that the evidence would show petitioner was not the person who committed the crime, even though petitioner ultimately did not testify and his counsel rested without adducing all of the promised evidence).

In Williams v. Bowersox, 340 F.3d 667 (8th Cir. 2003), the Eighth Circuit noted some of the aforementioned cases and stated that this "diversity of opinion alone suggests that the [state court] did not unreasonably apply Strickland." Id. at 672; *see also* Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004) (citing Williams, 340 F.3d at 671-72). This observation was also

recognized in <u>Tavares v. O'Brien</u>, No. 04-40059-FDS, 2007 WL 2908828 (D. Mass. Sept. 27, 2007), where the district court stated, "[g]iven the uncertainty in the law concerning whether failure to call promised witnesses constitutes ineffective assistance of counsel . . . [the court] cannot find that the state court unreasonably applied clearly established federal law when it denied [petitioner's] clam." <u>Id</u>. at *13. However, despite the difference of opinions amongst the courts on when a counsel's broken promise to a jury would amount to ineffectiveness, it appears that most courts that have addressed the issue have either concluded or suggested that counsel's failure to present promised testimony is not constitutionally deficient performance if counsel chose not to do so as part of a reasonable strategy supported by some unforeseeable event, or new development in the trial. Thus, the outcomes of cases that consider the effects of broken promises, as <u>Strickland</u> requires, are heavily fact-dependent and therefore varied.

Upon comparing these cases to the facts of the present case, it is clear that the state courts did not unreasonably apply <u>Strickland</u>. First, the state courts found that Mr. George's advice to Petitioner against testifying, even after he told the jury in his opening that Petitioner was going to testify, was not wholly unreasonable so as to render his performance constitutionally deficient under the first prong of <u>Strickland</u>.[13] While defense counsel in <u>Ouber</u> and <u>Anderson</u> amended

_____

[13] The satisfy the first prong of an ineffective assistance of counsel claim under <u>Strickland</u>, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. 466 U.S. at 687-88. "The Supreme Court has counseled that in order to assess counsel's performance objectively, reviewing courts must resist the temptation of hindsight, instead determining whether, given the specific factual setting, and counsel's perspective at the time, his strategic choices were objectively unreasonable." <u>Marshall v. Hendricks</u>, 307 F.3d 36, 106 (3d Cir. 2002). However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689 (quotation omitted). While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually

their defense strategy for no discernible reason, <u>Ouber</u>, 293 F.3d at 27, or after having given

insufficient thought to the proper strategy from the outset, <u>Anderson</u>, 858 F.2d at 18, Mr.

George's advice to Petitioner against testifying "was not an unreasoned position, a sudden

change of heart, or a lingering afterthought" that occurred to him only once his opening

statement had been made. *See* <u>Ruine v. Walsh</u>, No. 00 Civ. 3798RWS, 2005 WL 1705147, at

*22 (S.D.N.Y. July 20, 2005). Although it was always Petitioner's intention to testify at trial to

rebut the suspected testimony of Matthew Henkel, circumstances changed when, at the eleventh

hour, Mr. George was informed that Bruce Henkel, Sr. was going to take the stand and testify

that Matthew admitted to him that he was the one who killed Andrew Jones. While Petitioner

claims that he would have testified had Mr. George explained to him that Bruce Henkel, Sr.'s

testimony could not be used as substantive evidence that Matthew actually killed Jones, the

impeachment value in Bruce Henkel Sr.'s testimony provided a basis for Mr. George to damage

the credibility of Matthew Henkel. As the PCRA court correctly noted, it was not Petitioner's

burden to prove that Matthew, or anyone else, killed Andrew Jones, it was the Commonwealth's

burden to prove beyond a reasonable doubt that Petitioner did; and, if Bruce Henkel Sr.'s

testimony was to be believed, then it would have impeached the credibility of the only witness

who testified that Petitioner was the one who killed Jones.

Furthermore, as also noted by the PCRA court, the decision about whether Petitioner

should testify, taking into consideration Bruce Henkel, Sr.'s testimony, was not something that

occurred within a few "seconds" as falsely claimed by Petitioner at the hearing. The PCRA

---

unchallengeable," <u>Strickland</u>, 466 U.S. at 690, labeling a decision "trial strategy" or "tactic" does not "automatically immunize an attorney's performance" from Sixth Amendment challenge. <u>Coleman v. Sisto</u>, No. 2:09-cv-0020 DAD, 2012 WL 6020095, at *24 (E.D. Cal. Dec. 3, 2012) (quoting <u>United States v. Span</u>, 75 F.3d 1383, 1389 (9th Cir. 1996).

court noted that the recess during which time this discussion occurred lasted at least two hours, and Mr. George recalled a lengthy discussion with Petitioner and his family, where he reviewed Bruce Henkel Sr.'s testimony at length and discussed why he thought that testimony provided them with what was needed to argue that the Commonwealth failed to meet its burden. Therefore, while, in hindsight, it might not have been a wise decision for Mr. George to outline in his opening the potential testimony from Petitioner, it was not deficient under the first prong of <u>Strickland</u> to advise Petitioner against testifying when Bruce Henkel Sr. and Jr. chose to testify about information that was provided to Mr. George on the day the Commonwealth rested.

While it is not necessary to review <u>Strickland</u>'s prejudice prong, 466 U.S. at 697 (there is no reason for a court to address both components of the ineffective assistance inquiry "if the defendant makes an insufficient showing on one"), assuming Mr. George's performance had been deficient under <u>Strickland</u>, Petitioner would still have to demonstrate that there existed "a reasonable probability that, but for [Mr. George's] unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. In this case, there is nothing objectively unreasonable about the state courts' finding that Petitioner failed to show prejudice in that the outcome of the trial would have been different had Petitioner testified.

Petitioner argues that Judge Manning misapplied the prejudice prong of the <u>Strickland</u> standard by reviewing Mr. George's advice to Petitioner "in a vacuum" and not assessing counsel's errors under the totality of the circumstances. Specifically, he claims that Judge Manning did not account for Mr. George's opening where he promised that Petitioner would testify to the fact that he did not kill Andrew Jones. While it is true that, as a general rule, courts presume that the challenged action, *i.e.*, counsel's decision not to present promised evidence, "might be a sound trial strategy," the court must view the decision "in light of all the

circumstances." <u>Strickland</u>, 466 U.S. at 689-90.  Contrary to Petitioner's argument, Judge

Manning specifically stated in his Opinion that he "considered the fact that defense counsel, in

his opening statement, advised the jury that his client would testify and would contradict

Matthew Henkel's testimony."  (Resp't Ex. 50, ECF No. 15-9, p.32.)  He noted that Petitioner

was not prejudiced because the jury was instructed that "opening statements and closing

argument were not evidence" and further instructed that "the defendants had an absolute right not

to testify and that their decision to exercise that right could not be used against them." <u>Id</u>.

Furthermore, he pointed out that "the jury did hear evidence that Matthew Henkel was not being

truthful in his testimony implicating [Petitioner], which is essentially what defense counsel said

that [Petitioner] would say if he testified." <u>Id</u>.  Courts have found no ineffective assistance of

counsel, and specifically a lack of prejudice in similar circumstances.  *See* <u>Phoenix v. Matesanz</u>,

233 F.3d 77, 85 (1st Cir. 2000) (counsel was not ineffective for failing to present promised

evidence when other testimony attempted, and potentially achieved, the same result); <u>United</u>

<u>States v. McGill</u>, 11 F.3d 223 (1st Cir. 1993) (no ineffective assistance of counsel where defense

counsel did not present expert testimony promised in the opening statement, but was able to elicit

similar evidence through cross examination); <u>Woods v. Spearman</u>, No. 2:11-cv-03168, 2014 WL

3689363, at *24 (E.D. Cal. July 24, 2014) (state court's finding that the petitioner was not

prejudiced by attorney's failure to call witness after promising her testimony to the jury during

opening statement was not contrary to, or an unreasonable application of, clearly established

federal law because the evidence was presented to the jury in another manner); <u>Nguyen v. Cate</u>,

No. C09-03980 JSW, 2012 WL 850609, at *8-9 (N.D. Cal. Mar. 13, 2012) (defense counsel's

decision to rely on the weakness of the evidence to exonerate the petitioner rather than put the

petitioner on the stand as promised in his opening statement was a reasonable tactical decision

that did not result in prejudice to the petitioner because cross-examination of the petitioner posed considerable risks and defense counsel was able to elicit the necessary evidence through cross-examination of other witnesses).

Most importantly, the lack of prejudice with regard to Mr. George's advice to Petitioner not to testify was aptly summed up by the Superior Court when it stated that "admitting Matthew's alleged confession for substantive purposes would have had no affect on the outcome of this case." (Resp't Ex. 33, ECF No. 14-4, p.23.) To restate that portion of the Superior Court's opinion that was presented in the procedural background section, *supra*, "[f]or the confession to have had any impeachment value, the jury would have had to believe the confession was given and was true. The jury's verdict makes it clear it did not harbor such a belief. If the jury did not believe the confession was given and the confession was true, admitting the confession for substantive purposes would have been of little value to the defense." (Resp't Ex. 33, ECF No. 14-4, p.23.)[14]

Lastly, the Court will briefly address Petitioner's claim that his waiver of his right to testify was rendered unknowing and unintelligent by Mr. George's unreasonable advice not to testify, even though it has been determined that this was not objectively unreasonable advice. This Court has summarized the law with regard to whether trial counsel was ineffective in the advice given to a defendant relevant to his testimony at trial as follows:

> A criminal defendant has a constitutional right to testify on his own behalf, a right which may only be waived by the defendant. <u>Rock v. Arkansas</u>, 483 U.S. 44, 50-53, 107 S. Ct. 2704, 97 L.Ed.2d 37 (1987); <u>United States v.</u>

---

[14] While this in no way influences the Court's decision, it is not lost on this Court that Petitioner was in the courtroom when Judge Manning explained to the jury on two separate occasions (following the testimony of Bruce Henkel, Jr. and prior to the close of testimony) that Bruce Henkel, Jr.'s and Sr.'s testimony could only be used to impeach Matthew Henkel's credibility, and not for the truth of the matter asserted.

Pennycooke, 65 F.3d 9, 10 (3d Cir. 1995). Because the right to testify finds its foundation in the Constitution and the mandates of Due Process, a defendant's waiver of that right must be voluntary, knowing and intelligent. Pennycooke, 65 F.3d at 11. The duty of providing such advice on whether to testify and ensuring that any waiver is knowing and intelligent rests with defense counsel. Id. at 12. A presumption remains, however, that where a defendant is represented by counsel, counsel has presumably discussed the defendant's right to testify with him, and defendant voluntarily and intelligently waived that right. *See* United States v. Hatcher, No. 94-173-1, 1997 U.S. Dist. LEXIS 18043, at *9, 1997 WL 698488 (E.D. Pa. Nov. 6, 1997) (citing Pennycooke, 65 F.3d at 12-13.) Consequently, to succeed on a claim of ineffective assistance for failure to allow a defendant to testify, the petitioner must overcome these presumptions. Id. Moreover, in order to demonstrate prejudice for a claim of ineffective assistance for failure to allow a defendant to testify, a petitioner must put forth more than a "bald assertion" that he was not allowed to testify, including some specifics as to what his testimony would have been. Palmer v. Hendricks, 592 F.3d 386, 399 (3d Cir. 2010) (holding that petitioner's mere stated desire to tell his side of the story "falls far short of satisfying Strickland's prejudice element.").

Glenn v. Wynder, No. 06-513, 2012 WL 4107827, at *40 (W.D. Pa. Sept. 19, 2012).

The PCRA court found that Mr. George, Petitioner and Petitioner's family discussed Bruce Henkel, Sr.'s testimony at length before Petitioner made the ultimate decision to waive his right to testify on his own behalf. Petitioner has not overcome the presumption that he knowingly and intelligently waived that right. Thus, after applying the AEDPA's standard of review, Petitioner is not entitled to habeas relief because the ruling by the state court on this issue was not contrary to, nor an unreasonable application of, clearly established federal law.[15]

---

[15] Under 28 U.S.C. § 2254(d)(2), habeas relief may be granted if a petitioner can show that the state courts' decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This "requires review of whether there was sufficient evidence to support the state court's factual findings." Dennis, 834 F.3d at 281 (citing Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). Here, there is ample record support for the state courts' factual findings, and, in any event, Petitioner does not appear to rebut any of those factual findings by "clear and convincing evidence," which showing is required by 28 U.S.C. § 2254(e). As such, Petitioner does not argue that he is entitled to relief, nor should he be, under § 2254(d)(2).

## V.  **Certificate of Appealability**

A court should issue a Certificate of Appealability where a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  A petitioner meets this burden by showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, this Court will not issue a Certificate of Appealability.  A separate Order follows.

Dated:  November 9, 2017.


/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Magistrate Judge

Cc: Counsel of record
*Via CM/ECF Electronic Mail*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRAIG ELIAS, | ) | |
| | ) | Civil Action No. 14 – 1337 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| BRIAN COLEMAN, *Warden SCI-Fayette* and THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## <u>ORDER</u>

**AND NOW**, this 9th day of November, 2017, for the reasons stated in this Court's Memorandum Opinion filed contemporaneously herewith,

**IT IS HEREBY ORDERED** that the Petition for Writ of Habeas Corpus (ECF No. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk is directed to mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan

United States Magistrate Judge

Cc: Counsel of record
   *Via CM/ECF Electronic Mail*